**George Kenneth SCHENEKL, Appellant,**

v.

**The STATE of Texas, State.**

**No. 2–98–386–CR.**

Court of Appeals of Texas, Fort Worth.

June 10, 1999.

Rehearing Overruled Aug. 12, 1999.

Wheless, Walker & Baxter, Raymond G. Wheless, Plano, for Appellant.

Bruce Isaacks, Criminal District Attorney, Yolanda M. Joosten, Gracie Rodriguez, Doug Wilder and John Feldt, Assistant District Attorneys, Denton, Matthew Paul, State Prosecuting Attorney, Austin, for Appellee.

Panel F: CAYCE, C.J.; BRIGHAM and HOLMAN, JJ.

## OPINION

WILLIAM BRIGHAM, Justice.

The trial court found appellant guilty of boating while intoxicated and sentenced him to 180 days' confinement plus a $500 fine. In two points, he argues that the enforcement provision of the Water Safety Act (the Act)[1] violates the Fourth Amendment to the United States Constitution and that he was denied a speedy trial. We affirm.

### I. BACKGROUND

Around midnight on September 3, 1995, Texas Game Warden Patrick C. Canan was patrolling Lake Lewisville in his marked state patrol boat. He saw appellant leaving Sneaky Pete's Marina driving a 20 foot, 1993 Stingray. Under the authority of section 31.124(a) of the Act, Canan stopped and boarded appellant's boat to check for water safety equipment. Canan noticed that appellant was having trouble answering Canan's questions, that he was fumbling with his fingers, and that he smelled of alcohol. Canan performed a horizontal gaze nystagmus test on appellant and detected positive indications of intoxication. Canan requested that appellant follow him to shore for more sobriety tests. Appellant's performance on the additional tests indicated that he was intoxicated. Accordingly, Canan arrested appellant for boating while intoxicated. *See* TEX. PENAL CODE ANN. § 49.06 (Vernon 1994).

Appellant filed a motion to suppress the evidence of intoxication obtained as the result of Canan stopping his boat, and a motion to dismiss alleging that he was deprived of his right to a speedy trial. The trial court denied both motions. On July 2, 1998, appellant pleaded nolo con-

1. *See* TEX. PARKS & WILD.CODE ANN. §§ 31.001, 31.124 (Vernon 1991).

2. The chapter requires a boat operator to carry a certificate of number, and requires the boat to have proper numbering, lights, whistles and bells, life preservers, fire extinguish-

tendere, and the trial court sentenced him to 180 days' confinement.

### II. CONSTITUTIONALITY OF § 31.124

#### A. The Statute

■ In his first point, appellant contends that the trial court erred in failing to grant his motion to suppress evidence obtained as a result of his boat being stopped. Appellant argues that section 31.124(a) of the Act violates the Fourth Amendment prohibition against unreasonable search and seizure. Section 31.124(a) states:

> In order to enforce the provisions of this chapter,[2] an enforcement officer may stop and board any vessel subject to this chapter and may inspect the boat to determine compliance with applicable provisions.

TEX. PARKS & WILD.CODE ANN. § 31.124(a) (Vernon 1991).

The facts, as previously recited, are not disputed. Whether section 31.124(a) violates the Fourth Amendment is a purely legal question that we may review de novo. *See Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997).

#### B. Suspicionless Seizure

■ It is uncontested that a Fourth Amendment seizure took place. A person is "seized" within the meaning of the Fourth Amendment when the person is subjected to application of physical force or the person submits to an assertion of authority. *See California v. Hodari D.*, 499 U.S. 621, 627, 111 S.Ct. 1547, 1551, 113 L.Ed.2d 690 (1991). Canan approached appellant in a marked state patrol boat wearing a uniform, identified himself as a game warden, and asked to see appellant's water safety equipment. Appellant sub-

ers, flame arrestors, ventilators, a muffler, and rearview mirrors. *See* TEX PARKS & WILD. CODE ANN. §§ 31.021 (Vernon Supp.1999), 31.028 (Vernon 1991), 31.064–.066 (Vernon Supp.1999), 31.067–.071 (Vernon 1991).

mitted to Canan's authority, and was thus seized, when he stopped and let Canan board his vessel. *See id.; see also State v. Sanchez,* 856 S.W.2d 166, 168 (Tex.Crim. App.1993) (stopping a vehicle constitutes a seizure under the Fourth Amendment).

■ The Fourth Amendment does not prohibit all searches and seizures, only those that are deemed unreasonable. *See Elkins v. United States,* 364 U.S. 206, 222, 80 S.Ct. 1437, 1446, 4 L.Ed.2d 1669 (1960). Generally, this means a government official may not conduct a search and seizure unless there is some individualized suspicion of wrongdoing. *See Chandler v. Miller,* 520 U.S. 305, 308, 117 S.Ct. 1295, 1298, 137 L.Ed.2d 513 (1997); *see also Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967) (recognizing that warrantless searches are per se unreasonable unless they fall within one of a few specifically established and well delineated exceptions). However, under certain limited circumstances, searches and seizures conducted without individualized suspicion may be reasonable under the Fourth Amendment. *See Chandler,* 520 U.S. at 308, 117 S.Ct. at 1298. The seizure of appellant's boat falls into one of these limited circumstances; a category known as a suspicionless search and seizure.

■ A suspicionless search and seizure under the Fourth Amendment is one that occurs in the absence of a warrant and without probable cause or reasonable suspicion. *See Sanchez,* 856 S.W.2d at 168, n. 2. Neither the Supreme Court nor any Texas court has addressed the Fourth Amendment reasonableness of suspicionless searches and seizures conducted under the authority of section 31.124 of the Act. Courts have, however, addressed the issue in other contexts, including: ships on the high sea, *see United States v. Villa-*

*monte–Marquez,* 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983); automobile sobriety checkpoints, *see Michigan Dep't of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) and *Sanchez,* 856 S.W.2d at 168; fixed border patrol checkpoints, *see United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); stops to check for valid driver's license and registration, *see Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); searches of real property (commercial and private), *see Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (private) and *New York v. Burger,* 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) (commercial); and random drug testing, *see Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (interscholastic athletes), *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (United States Customs Service employees), *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (railroad employees).

Though none of these cases are directly on point, they share a common theme. That common theme, and the standard we apply here, is most succinctly stated in *Prouse.* In determining whether Delaware Police could, without probable cause or reasonable suspicion, stop automobile drivers to check for a valid driver's license and registration, the Court stated that, "[T]he permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Prouse,* 440 U.S. at 654, 99 S.Ct. at 1396.[3] The Court further noted that the essential purpose of the Fourth Amend-

---

**3.** Though slightly different tests have been applied, all suspicionless search and seizure cases balance governmental interest against individual intrusion in some fashion. *See Vernonia Sch. Dist.,* 515 U.S. at 652–53, 115 S.Ct. at 2390; *Sitz,* 496 U.S. at 455, 110 S. Ct

at 2488; *Von Raab,* 489 U.S. at 665–66, 109 S.Ct. at 1391; *Prouse,* 440 U.S. at 654, 99 S.Ct. at 1396; *Martinez–Fuerte,* 428 U.S. at 554–55, 96 S.Ct. at 3081; *Camara,* 387 U.S. at 536–37, 87 S.Ct. at 1735.

ment is to impose a standard of reasonableness upon the exercise of discretion by government officials, including law enforcement agents, in order to safeguard the privacy and security of individuals against arbitrary invasions. *See Prouse,* 440 U.S. at 653–54, 99 S.Ct. at 1396.

## C. Application

### State Interest

The State interest is given at section 31.002:

> It is the duty of this state to promote recreational water safety for persons and property in and connected with the use of all recreational water facilities in the state, to promote safety in the operation and equipment of facilities, and to promote uniformity of laws relating to water safety.

Tex. Parks & Wild.Code Ann. § 31.002 (Vernon 1991).

The State has a vital interest in protecting the safety of its citizens. States have traditionally had great latitude under their police powers to legislate to protect the "lives, limbs, health, comfort, and quiet of all persons." *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 756, 105 S.Ct. 2380, 2398, 85 L.Ed.2d 728 (1985). In exercising such police power, "the State acts in self-defense to preserve its existence by protecting its citizens in life, health and happiness." *Vaughan and Sons, Inc. v. State,* 737 S.W.2d 805, 815 (Tex.Crim.App.1987) (Clinton, J., concurring).

### Level of Intrusion

■ In weighing the level of intrusion, we consider the individual's expectation of privacy, the length and scope of the detention, the alternative means available in light of the statute's contribution to the state interest, and the discretion given law enforcement officials. *See generally Prouse,* 440 U.S. at 657–62, 99 S.Ct. at 1398–1401.

■ Appellant had an expectation of privacy in his boat. He had a possessory interest, was legitimately in the boat, had control of the boat, and had the right to exclude others. *See generally Calloway v. State,* 743 S.W.2d 645, 651 (Tex.Crim.App. 1988) (listing factors relevant to a determination of whether an objective expectation of privacy exists). However, like an automobile, the expectation of privacy in a recreational boat is not as great as that in a home. *See generally Carroll v. United States,* 267 U.S. 132, 153, 45 S.Ct. 280, 285, 69 L.Ed. 543, (1925) (Fourth Amendment must recognize difference between a search of a store, house, or other structure and a search of a ship, motor boat, wagon, or automobile); *United States v. Albers,* 136 F.3d 670, 673 (9 th Cir.1998) (government's traditional power to board a vessel is far greater than its power to enter a motor-home or car). *But see United States v. Cadena,* 588 F.2d 100, 101 (5 th Cir.1979) (greater expectation of privacy aboard a vessel because "[t]he ship is the sailor's home."). Thus, while there is an expectation of privacy in boats covered under the Act, it is a diminished one.

The scope and length of the detention here were not intrusive. The enforcement provision authorizes detention only for the purpose of ensuring compliance with the registration and safety requirements. *See* Tex. Parks & Wild.Code Ann. § 31.124. The intrusion is minimal in scope because the search may only be directed at the safety items listed in the statute. Further, while the boat must carry several safety and registration items, only a brief visual inspection is necessary to determine compliance. Therefore, the scope and length of the seizure favor a finding that the intrusion is minimal.

The Court in *Prouse* based its decision, at least in part, on the existence of available alternative means of detecting licenseless drivers. *See Prouse,* 440 U.S. at 659, 99 S.Ct. at 1399. *But see Sitz,* 496 U.S. at 453–54, 110 S. Ct at 2487 ("the choice among [preferable methods of alternative

law enforcement] remains with the governmental officials"). The foremost method of enforcing traffic and vehicle safety regulations is acting on observations. *See Prouse*, 440 U.S. at 660, 99 S.Ct. at 1399 (noting that violations of minimum vehicle safety requirements are "observable, and something can be done about them by the observing officer, directly and immediately.").

Additionally, the Court considered outward indications of compliance with registration and safety requirements. For example, the Court noted that in Delaware, license plates were evidence that a vehicle was properly registered and had passed required safety inspections. *See id.* The Court opined in dicta that a possible alternative to spot checks was questioning all oncoming traffic at a fixed checkpoint, akin to those used in border patrol checkpoints. *See id.* at 663, 99 S.Ct. at 1401. This, the court reasoned, would result in less intrusive detentions and limit the exercise of discretion for law enforcement officials. *See id.* Ultimately, the Court held that spot checks did not appear necessary given the alternative mechanisms available, and held the practice unconstitutional. *See id.* at 660, 99 S.Ct. at 1399–1400.

The alternative mechanisms available in *Prouse* are not present here. Some of the required safety equipment is not capable of outward observation. For example, life jackets and fire extinguishers may be secreted and are also readily detachable. It may well be impossible to observe from a distance that a boater is not carrying the proper number of life jackets or a fire extinguisher. Additionally, though required numbering on the boat is evidence of proper registration, there is no safety inspection on which registration is contingent. Thus, unlike license plates on a car, the numbers on a boat do not indicate compliance with safety requirements.

Further, fixed checkpoints are not a viable alternative. As the Supreme Court noted in *Villamonte–Marquez*, "vessels can move in any direction at any time and need not follow established 'avenues' as automobiles must do." 462 U.S. at 589, 103 S.Ct. at 2580. Boats are thus not susceptible to fixed checkpoints on the water. Also, because safety items such as life jackets and fire extinguishers are readily detachable, a checkpoint at a dock or boat ramp would be ineffective in determining whether a boater complied with safety requirements while actually on the water. There appear to be no other means as effective as the seizures authorized by the Act.

Finally, we consider the discretion given law enforcement. The Act's enforcement provision applies to "all vessels on public water," and a stop may be made at any time. TEX. PARKS & WILD.CODE ANN. § 31.004 (Vernon Supp.1999). Under the statute, there are no restrictions on a law enforcement officer's discretion. This unfettered discretion conflicts with the Supreme Court's repeated insistence, when construing the Fourth Amendment, that "the discretion of the official in the field be circumscribed, at least to some extent." *See Prouse*, 440 U.S. at 661, 99 S.Ct. at 1400 (and cases cited therein). Thus, the level of intrusion, otherwise minimal, is heightened by the lack of restraint on a law enforcement officer's discretion.

This does not, however, render the intrusion unreasonable under the Fourth Amendment. Although the level of intrusion is escalated by the lack of restraint on the discretion of individual law enforcement officials, it does not rise to an unreasonable level. The reduced expectation of privacy in a boat, the brevity of the encounter, and the lack of alternative means render the level of intrusion reasonable under the circumstances.

Balancing the State's substantial interest in recreational water safety against the intrusion involved, the enforcement provision of the Act does not authorize searches and seizures that violate the Fourth Amendment. Accordingly, we hold that

section 31.124 is constitutional and we overrule appellant's first point.

### III. Speedy Trial

■ In his second point, appellant argues he was denied his right to a speedy trial. Whether appellant was denied a speedy trial is a purely legal question subject to de novo review, and, like appellant's first point, involves a balancing test. *See Johnson v. State,* 954 S.W.2d 770, 771 (Tex.Crim.App.1997) ("Review of [the] individual factors necessarily involves fact determinations and legal conclusions. The balancing test as a whole, however, is a purely legal question. Legal questions are reviewed *de novo.*"). Under the Supreme Court case of *Barker v. Wingo,* we must consider (1) the length of the delay; (2) reason for the delay; (3) assertion of the right; and (4) prejudice to the accused. 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972). Though no single factor is dispositive, assertion of the right is entitled to strong evidentiary weight. *See Haney v. State,* 977 S.W.2d 638, 642 (Tex. App.—Fort Worth 1998, pet. filed).

### A. Length of Delay

■ To trigger a speedy trial analysis, the defendant has the burden of first demonstrating a delay sufficient in length to be considered presumptively prejudicial under the circumstances of the case. *See Barker,* 407 U.S. at 530, 92 S.Ct. at 2192. Only if the defendant meets this burden must we continue with the analysis. The length of delay is measured from the time of arrest until the time of trial. *See Emery v. State,* 881 S.W.2d 702, 708 (Tex. Crim.App.1994), *cert. denied,* 513 U.S. 1192, 115 S.Ct. 1257, 131 L.Ed.2d 137 (1995). Generally speaking, delays exceeding eight months are considered presumptively unreasonable and sufficient to trigger a speedy trial analysis. *See Doggett v. United States,* 505 U.S. 647, 651, 112 S.Ct. 2686, 2690, 120 L.Ed.2d 520 (1992).

Appellant was arrested on September 3, 1995 and tried on July 2, 1998. Thus, from arrest to trial, two years, ten months and twenty-nine days elapsed. In its brief, the State concedes, correctly, that this delay is sufficient to trigger consideration of the remaining *Barker* factors.

### B. Reasons for the Delay

At the hearing on appellant's motion to dismiss for lack of a speedy trial, the trial court determined that the State was not to blame for the delay. The court noted that, at the time of the hearing, the misdemeanor courts in Denton County had over 2,500 requests for jury trial. The court also noted that the State announced "ready for trial" on the day it filed the information, August 27, 1996. The trial court placed the blame on the court system, noting "[i]ts due to no fault of the State of Texas that his case has not been brought to a jury trial, brought to fruition at this time. Its due to ... the backlog of cases that we have currently pending in our courts."

■ Overcrowded docket is a neutral reason for delay. *See Barker,* 407 U.S. at 531, 92 S.Ct. at 2192. Even so, the ultimate responsibility for bringing cases to trial in a timely manner rests with the government. *See id.* Additionally, the State proffered no explanation for the delay other than to ask the court to take judicial notice of its file on the case, and that it announced ready for trial on August 27, 1996. Therefore, we hold that the second *Barker* factor weighs against the State, albeit slightly.

### C. Assertion of the Right

■ We next consider whether appellant diligently asserted his right to a speedy trial. On May 5, 1997, appellant moved to set a trial date. One year later, on May 5, 1998, appellant moved to dismiss the case for lack of a speedy trial.

■ Assertion of the right to a speedy trial is a weighty factor in the *Barker* balancing test. *See Barker,* 407

U.S. at 531–32, 92 S.Ct. at 2192–93. We have stated that assertion of the right "is entitled to strong evidentiary weight." *See Haney,* 977 S.W.2d at 642. Failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial. *See Clarke v. State,* 928 S.W.2d 709, 714 (Tex.App.—Fort Worth 1996, pet. ref'd). Additionally, a defendant's motion to dismiss, rather than a request for a speedy trial, may attenuate the claim. *See Floyd v. State,* 959 S.W.2d 706, 710 (Tex.App.—Fort Worth 1998, no pet.).

Here, appellant never asserted his right to a speedy trial. Appellant was arrested on September 3, 1995. The State filed the complaint and information on August 27, 1996. Nothing in the record indicates that appellant complained of lack of a speedy trial during that period. On February 10, 1997, the State moved for a continuance. Appellant did not object. On May 5, 1997—twenty months after his arrest—appellant asked for a trial date. He did not, however, assert his right to a speedy trial. Finally, when appellant finally did raise his right to a speedy trial, he did not ask for a trial, he moved to dismiss the case based on a lack of one. Appellant's failure to diligently and persistently assert the right, coupled with his moving to dismiss rather than asking for a speedy trial, cause the third *Barker* factor to weigh against him. *See Barker,* 407 U.S. at 531–32, 92 S.Ct. at 2192–93; *Haney,* 977 S.W.2d at 642; *Floyd* 959 S.W.2d at 710.

### D. Prejudice

■ The final *Barker* factor to consider is prejudice to the accused. The prejudice factor must be assessed in the light of the interests of defendants which the speedy trial right was designed to protect: (1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern of the accused; and (3) to limit the possibility that the defense will be impaired. *See Harris v. State,* 827 S.W.2d 949, 957 (Tex.Crim.App.), *cert. denied,* 506

U.S. 942, 113 S.Ct. 381, 121 L.Ed.2d 292 (1992). It is the defendant's burden to make a prima facie showing of prejudice. *See Clarke,* 928 S.W.2d at 716. Once the defendant does so, it is the State's obligation to prove "the accused suffered no serious prejudice beyond that which ensued from the ordinary and inevitable delay." *Ex parte McKenzie,* 491 S.W.2d 122, 123 (Tex.Crim.App.1973); *Haney,* 977 S.W.2d at 643.

Appellant was incarcerated on the night of his arrest, but not thereafter. Thus, there was no oppressive pretrial incarceration.

As to appellant's anxiety, he testified at the hearing on his motion to dismiss that the delay in bringing him to trial put him on "pins and needles" the whole time. The State fails to effectively rebut appellant's testimony regarding his anxiety, arguing only that he did not present evidence establishing that he suffered anxiety to a harmful degree.

■ Regarding impairment of a defense, appellant argues that there were two witnesses who had been with him the night of his arrest. Appellant argues that these witnesses would have testified in his behalf, but that he could no longer locate them.

■ In order to show prejudice caused by lost testimony, appellant must show: (1) the witness was unavailable at the time of trial; (2) the testimony that would have been offered was relevant and material to the defense; and (3) due diligence was exercised in an attempt to locate the witnesses for trial. *See Parkerson v. State,* 942 S.W.2d 789, 792 (Tex.App.—Fort Worth 1997, no pet.) (citing *Swisher v. State,* 544 S.W.2d 379, 382 (Tex.Crim.App. 1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 734, 50 L.Ed.2d 749 (1977)). Appellant's argument that these two potential witnesses would have testified in his behalf, without more, is not only speculative but fails to meet any of the above stated criteria.

**314**

Appellant was not oppressed by pretrial incarceration and has not shown that his defense has been impaired by the delay. Though appellant has established, and the State has failed to rebut, the anxiety element, it is not enough to cause the prejudice prong to weigh in appellant's favor.

The length of delay from arrest to trial in this case is suspect. The State's reason for delay weighs in appellant's favor, but only slightly. Conversely, appellant's failure to diligently and persistently assert the right, coupled with the lack of prejudice, tip the scale in favor of the State. Accordingly, we hold that appellant was not denied his constitutional right to a speedy trial and overrule his second point.

### CONCLUSION

Having overruled appellant's points, we affirm the trial court's judgment.